# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR09-00218-TUC-FRZ(JM) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Jose Jesus Quintero-Morales, | |
| Defendant. | |

Pursuant to District Judge Zapata's order, Defendant's Evidentiary Hearing occurred before Magistrate Judge Marshall on October 31 and November 9, 2011.[1] Defendant was present and assisted by counsel. The Government presented four witnesses and admitted one exhibit into evidence. The Defendant testified as well.

## I.   BACKGROUND

On September 14, 2010, Defendant was convicted of Transportation of an Illegal Alien and sentenced to time served followed by 36 months of supervised release. His term of supervised release began to run on September 14, 2010, when he was released from prison and was set to expire on September 13, 2013. (CR 09-218 FRZ-JM).

On September 26, 2011, Defendant was charged with Conspiracy to Possess with Intent to Distribute less than 50 Kilograms of Marijuana. According to the Complaint, on September 24, 2011, U.S. Border Patrol camera operators observed two individuals passing

---

[1] Transcripts of the hearing were ordered and prepared. The transcript of the October 31, 2011 proceedings is identified herein as "Tr1." The transcript of the November 9, 2011 proceedings is identified as "Tr2."

two packages over the international boundary fence in downtown Nogales, Arizona. While maintaining constant visual of the two men, the camera operators directed Border Patrol Agents via service radio to their location approximately ten yards north of the international boundary fence. Agents apprehended the two men as well as two bundles of marijuana weighing a total of 7.25 kilos. The men were identified as Defendant Quintero-Morales and Defendant Martinez.

On October 19, 2011, an indictment was issued charging both Defendants with Conspiracy to Possess with Intent to Distribute Marijuana and Possession with Intent to Distribute Marijuana. Trial is scheduled for December 13, 2011, before District Court Judge Bury. Defendant was ordered detained pending trial. (CR 11-3645 DCB-CRP).

Based on Defendant's arrest on September 26, 2011, his Probation Officer in CR09-00218-FRZ(JM) filed a Petition to Revoke Supervised Release alleging violations of the following conditions:

> Standard Condition No. 1: You shall not commit another federal, state or local crime during the term of supervision.
>
> Standard Condition No. 9: You shall not purchase, possess, use, distribute or administer any narcotic or other controlled substance...
>
> Standard Condition No. 11: You shall not associate with any persons engaged in criminal activity . . .

## II. EVIDENTIARY HEARING

Border Patrol Agent Manuel Molina testified that during the evening hours of September 24, 2011, he was assigned to radio/camera operations at the Nogales Border Patrol Station in downtown Nogales, Arizona. (Tr1. 5-6). The area is an urban residential area that abuts the international border. (Tr2. 28-29). Agent Molina explained that his assignment was twofold: it required him to act as the centralized communication point for agents out on patrol and to operate a thermal imaging camera to scan the international boundary fence for illegal entries and narcotics smuggling. (Tr1. 5). The camera detected different "heat signatures" and produced "pretty detailed" black and white thermal images, but did not

produce images that allowed Agent Molina to distinguish physical characteristics, such as faces, or exact details, such the color of clothing. (Tr1. 6; 17). The camera had recording capabilities that were not controlled by Agent Molina, but by Border Patrol's Intellignence Department. (Tr1. 18). However, when Agent Molina requested a recording of the events of September 24, he was told that the recording had stopped at around 4:00 p.m. and that the images could not be retrieved. (Tr1. 19-20).

At about 11 p.m., while using the thermal imaging camera, Agent Molina saw four individuals on the Mexican side of the border at Nogales throw two packages over the international boundary fence to two persons who were on the U.S. side of the fence. (Tr1. 5-10). One of the individuals ("Individual A") on the U.S. side of the fence picked-up both packages, handed one of the packages to the second man ("Individual B") with him on the U.S. side, and both men then walked north to a private property fence line that is ten yards north of the international fence. (Tr1. 11). Individual A then handed his package to Individual B, who now had both packages. Individual A then walked to a pickup truck parked in the area, got in and sat down. (Tr1. 11-12).

In the meantime, Individual B was walking north through a nearby apartment complex located at the end of East Street. (Tr1. 12; Exhibit 1 (map)). As Agent Molina described what he was seeing to the agents assigned to the area, Individual B attempted to hide behind a shed or a small wall located at the north end of the apartment complex, dropped the two packages, and proceeded to walk in a "relaxed manner" as the agents approached the area. (Tr1. 12; 21; 25). Agent Molina directed the agents at the scene to the location behind the shed where they retrieved the two packages which were later determined to contain marijuana. (Tr1. 13; Tr2. 7). Individual B was taken into custody. (Tr2. 7).

During the four or five minutes this was happening, Individual A remained in the pickup, and then slowly rolled the truck from were it had been parked toward a dirt portion of East Street where he turned left and proceeded very slowly toward the north where the agents were centralized. (Tr1. 14; 27). Agent Molina informed the agents at the scene that

the pickup, which was being driven by one of the individuals who had initially received the packages, was leaving the area. (Tr1. 14; 28; Tr2. 7-8). Agent Molina then saw the other agents approach the pickup. (Tr1. 14-15). Border Patrol Agent Admonson spoke to the driver, who was later identified as Defendant Quintero-Morales, and took him to where the other agents were located. (Tr2. 8). Agent Jason Dattilo then spoke to the driver and requested permission to search the pickup. (Tr2. 8-9). Not finding any contraband in the vehicle, the driver was released and the vehicle left the area. (Tr1. 28-29; Tr2. 9, 19). Until the pickup drove away, Agent Molina maintained constant surveillance over both Individuals A and B, but he did not know who was in the pickup when it left the area. (Tr1. 15; 24; 29). About 15 or 20 minutes later, after inquiring of the agents on the ground, Agent Molina was told that the two bundles had been found and that the investigation was proceeding. (Tr1. 29-30).

After determining the status of the investigation, Agent Molina "moved on to other things." (Tr1. 30). However, he later received a call from Border Patrol Supervisor Gilberg, who had been summoned to the scene by Agent Dattilo, and who asked Molina what he had seen. (Tr1. 32-33, Tr2. 30). This call was prompted by confusion among the investigating agents about the role of the individual driving the pickup. (Tr2. 10-11, 32). Agent Molina explained that Individual A was the driver of the pickup truck and had handed a package to Individual B and, therefore, he was not expected to have any contraband in the pickup. (Tr2. 11, 32-33). After the conversation, Supervisor Gilberg told Agent Molina that they were "going to go and make contact with the subject," and attempt to take him into custody. (Tr1. 33; Tr2. 33).

Approximately 20 to 30 minutes after the initial contact, Defendant Quintero-Morales returned to the area and parked the pickup in the parking lot of the apartment complex. (Tr2. 12, 21). At the time, there was also a small child standing outside the apartment complex. (Tr2. 22). When Quintero-Morales arrived he first attempted to walk over to the child. (*Id.*). When agents asked him to come over to them, Quintero-Morales kept walking. (*Id.*). The

- 4 -

agents began walking toward him and he then turned and began walking toward the agents. (*Id.*). Quintero-Morales told Agent Dattilo that he lived at the apartment building. (Tr2. 21). Agent Dattilo, after consultation with Supervisor Gilberg, placed Quintero-Morales under arrest. (Tr2. 12, 23, 33). At the time, a female came out of the apartment complex and attempted to console the child, who was upset by the arrest, and take her back into the apartment building. (Tr. 23-24).

Quintero-Morales contends he was not Individual A as described by Agent Molina. Quintero-Morales explained that he had worked at a house he was fixing-up that day and had arrived home to find that there was no water. (Tr2. 47-48). He then took his 19 month-old son with him to get water and, at his young son's request, went to Burger King to get hamburgers and french fries. (Tr2. 47). When they got back to the apartment complex, Quintero-Morales parked near the entrance to the complex, which is near where his apartment is located, so that he could more easily take the water and food to the apartment. (Tr2. 48). After taking his son, the food and the first gallon of water to the apartment and then the second gallon of water to the apartment, Quintero-Morales went back to his truck for a third time to lock it because he had seen a "young man around there [that he] had never seen before." (Tr2.49).

During this third trip to the truck, Quintero-Morales saw the young man he had seen previously now running toward a fence and "heard some voices talking to him on the Mexican side and it looked like they were passing – crossing some stuff," and told Quintero-Morales that if he said anything they would "fuck [him] over." (Tr2. 50, 62). The young man then "took off running" and Quintero-Morales did not see him again. (*Id.*). He was then approached by an officer, told him that he was home and did not know what was going on, and consented to a search of his truck. (Tr2. 50-51). The search took two or three minutes and Quintero was detained for a few more minutes because "they were investigating the videos." (Tr2. 51, 53-54). During this initial contact, Quintero-Morales left a message for his wife to have his daughter bring the hamburgers out to show the agents that he had just

come from the store. (Tr2. 55-56, 57). However, before she came out, he was then told he could leave. (Tr2. 54, 56).

After the search, Quintero-Morales left the apartment complex and returned to the home he was renovating to continue his work there. (Tr2. 56). He then realized that his daughter may have been sent outside by his wife, and returned to the apartment complex about 15 minutes after he left. (Tr2. 56-57). When he arrived at the complex, his daughter was there with a bag of hamburgers in her hands. (Tr2. 57). He got out of his truck, went to where his daughter was, and got the bag of hamburgers. (*Id.*). At that time, the agents were calling for him, and after first ignoring them, he decided to talk to them because they were yelling at his little girl. (*Id.*) It was at this point that he was arrested. (Tr2. 58).

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

A court may revoke a defendant's supervised release if it finds by a preponderance of the evidence that the defendant violated a condition of his supervised release. *United States v. Musa*, 220 F.3d 1096, 1100 (9th Cir.), *cert. denied*, 531 U.S. 999, 121 S.C. 498, 148 LED.2d 469 (2000); *see also* 18 U.S.C. § 3583(e)(3). The Federal Rules of Evidence do not apply to a revocation hearing. Fed.R.Evid. 1101(d)(3); *United States v. Martin*, 984 F.2d 308, 310-11 (9th Cir.1993). Based on these standards, the Court is satisfied that Quintero-Morales is the Individual A seen by Agent Molina and arrested by the agents at the scene.

Quintero-Morales correctly points out that Agent Morales is the only agent who presented any evidence of the Defendant's guilt. Moreover, he contends, Agent Morales lack of concentration on the events is illustrated by the fact that he did not call the agents on the scene when they initially released Quintero-Morales and tell them that they just released one of the individuals who received the packages at the border. Agent Molina testified that he maintained constant visual contact from the time Quintero-Morales received the packages over the fence from Mexico, handed the package off to the other individual and went to his truck, rolled the truck up East Street and during the initial interaction with the agents on the scene. Given the details of Agent Molina's testimony on these events, there is little to

suggest that he was distracted or unable to monitor both individuals involved. Also, as Agent Molina explained, once the agents were at the scene and had found the two bundles and had made contact with the individuals he had directed them to, he "moved on to other things." (Tr1. 29-30). At that point, there was no reason for him to continue uninterrupted surveillance of the scene. As he explained it, it was only some time later when he contacted the agents on the scene so that he could record the outcome of the investigation in his log. (Tr1. 30).

The confusion that resulted in Quintero-Morales initial release was further explained by Supervisor Gilberg. Agent Molina had initially described Quintero-Morales as "a carrier," which led the agents at the scene to understand that contraband would be found in his vehicle. (Tr2. 20). Understandably, not finding anything in the vehicle, Quintero-Morales was released as agents did not find evidence that he was involved. It was only later, after Gilberg had called Morales, that Quintero-Morales role was clarified. (Tr2. 23). Once Gilberg was told of Quintero-Morales' role, he realized he was released in error and made the decision to detain him upon his return.

Quintero-Morales also capitalizes on the camera's inability to capture detail. He argues that there is no description of his face or the color of the vehicle he was driving, but only a general description. He suggests that Molina was likely watching the other individual and was distracted while the first truck he saw left the scene and Quintero-Morales arrived bearing his hamburgers. This argument overlooks a number of considerations. Molina credibly testified that he maintained constant surveillance on the vehicle until the time it left the scene. Even Quintero-Morales admits it was he who was in the vehicle, both when it left and when it returned. Moreover, there were no other people or vehicles in the area that could be confused with Quintero-Molina or his pickup and he likely would have witnessed the multiple trips from the apartment and back to deliver hamburgers if those trips had actually occurred. Thus, the camera's inability to capture detail lends little to his argument that he was not involved.

Quintero-Morales also argues that the government's failure to produce a recording of the events is "strange" in light of the fact that such recordings are regularly maintained. However, both Supervisor Gilberg and Agent Molina described their efforts to obtain the footage right after the events transpired. If its loss was a cover-up by Molina to hide his mistakes, he would have been required to coordinate his efforts not only with Supervisor Gilberg, but with the IT and Internal Affairs departments who are charged with maintaining such footage. Given the short lapse of time and the breadth of effort that would have been required to complete such a task, the Court finds that more likely an innocent human or technological error occurred that prevented the agents from obtaining the footage.

The Court also finds that Quintero-Morales' version of events raises some unanswered questions. As mentioned above, had Quintero-Morales made a number of trips to and from his apartment dropping off his son and delivering water and food, the trips would have been noticed by Agent Molina. So either they did not happen or they were overlooked. Other facts in Quintero-Morales' version do not ring true and thus suggest that it is the Defendant, and not the agents, who is less credible. Quintero-Morales testified that he left a message with his wife to send his daughter out with the hamburgers as proof that he was not involved. However, after the search and initial release, and despite the late hour, Quintero-Morales did not go to the apartment to let his wife and daughter know not to come out. Rather, without a word to his family, he claims he left to go back and work on his other house. Minutes later, he claims he remembered that he asked for his daughter to come out, then hurriedly returned home in case she had. The question that immediately comes to mind is why didn't he merely call home and let his wife know where he was and that his daughter and the hamburgers were no longer needed outside? Looking at this story versus that offered by the agents, the Court finds that the preponderance of the evidence supports a finding that the agents version is closer to the truth than is the Defendant's.

Thus, the government has presented sufficient evidence to prove by a preponderance of the evidence that Defendant committed a new crime in violation of the terms of his supervised release.

**IV. RECOMMENDATION FOR DISPOSITION BY THE DISTRICT COURT JUDGE**

Based on the foregoing and pursuant to 28 U.S.C. § 636 (b) and Local Rule 1.7(d)(2), Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge **RECOMMENDS** that the District Court, after an independent review of the record, find that the Defendant violated his conditions of supervised release.

Pursuant to 28 U.S.C. § 636 (b), any party may serve and file written objections with the District Court within fourteen (14) days of being served with a copy of this Report and Recommendation. If the objections are not timely filed they may be deemed waived. If any objections are filed, this action should be designated with the following case number **CR09-00218-TUC-FRZ**.

DATED this 21st day of November, 2011.

*Jacqueline Marshall*
Jacqueline Marshall
United States Magistrate Judge